No. 25-4239

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

JOSE BELMONTE CARDOZO,
*Defendant/Appellant.*
_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)
_____

REPLY BRIEF OF THE APPELLANT
_____

GEREMY C. KAMENS
Federal Public Defender

Todd M. Richman
Salvatore M. Mancina
Assistant Federal Public Defenders
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Todd_Richman@fd.org
Sam_Mancina@fd.org

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. ii

Introduction ........................................................................................................... 1

Argument ................................................................................................................. 5

I.  *Ickes* Does Not Control Because the Fourth Amendment Issue Presented Here Was Neither Raised nor Litigated in *Ickes* and Because Its Reasoning Is Irreconcilable with *Riley*. ...................................................... 5

    A.  The Passage from *Ickes* the Government Relies Upon Is *Dicta* Because the Parties Did Not Raise or Litigate a Fourth Amendment Claim and It Was Unnecessary to the Decision. ............... 5

    B.  *Ickes's* Holding That Computers and Hard Drives Were Indistinguishable for Privacy Purposes from Any Other "Cargo" Carried by Travelers Is Fundamentally Irreconcilable with *Riley*. ........................................................................................................ 10

II. The Search Here Was Not Supported by Individualized Reasonable Articulable Suspicion ....................................................................................... 12

    A.  The Cash App Report—Even Taking Reasonable Inferences in the Government's Favor—Provides No Individualized Suspicion About Mr. Belmonte Cardozo. ........................................................... 12

    B.  The Information About Travel from Bolivia Failed to Distinguish Mr. Belmonte Cardozo from Any Other Traveler at Dulles Airport. ............................................................................................. 15

III. Good-Faith Reliance on Binding Precedent Does Not Excuse a Fourth Amendment Violation When Agents Act in the Absence of Authority ........ 21

Conclusion ............................................................................................................. 24

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021)......................................................23

*Chandler v. Miller*, 520 U.S. 305 (1997)..................................................................13

*Davis v. United States*, 564 U.S. 229 (2011) ............................................................21

*Desroches v. Caprio*, 156 F.3d 571 (4th Cir. 1998) ..................................................13

*Illinois v. Wardlow*, 528 U.S. 119 (2000)...............................................................21

*Pittston Co. v. United States*, 199 F.3d 694 (4th Cir. 1999)................................8, 9

*Reid v. Georgia*, 448 U.S. 438 (1980) ......................................................................16

*Riley v. California*, 573 U.S. 373 (2014) ................................................. 2, 4, 10, 11

*Terry v. Ohio*, 392 U.S. 1 (1968) ...................................................................... 14, 18

*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) .............................. 21, 22

*United States v. Brugal*, 209 F.3d. 353 (4th Cir. 2000) (en banc)..........................15

*United States v. Castillo*, 70 F.4th 894 (5th Cir. 2023) ..........................................23

*United States v. Curry*, 965 F.3d 313 (4th Cir. 2020) ............................................12

*United States v. Feliciana*, 974 F.3d 519 (2020) .....................................................16

*United States v. Foster*, 634 F.3d 243 (4th Cir. 2011)............................................14

*United States v. Horsley*, 105 F.4th 193 (4th Cir. 2024) ..........................................8

*United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024)..............................................10

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005)...................................... *passim*

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) ................................... *passim*

*United States v. Lender*, 985 F.2d 151 (4th Cir. 1993)............................................21

*United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011) ........................... 14, 15

*United States v. McCoy*, 513 F.3d 405 (4th Cir. 2008) .............................................16

*United States v. Mendez*, 103 F.4th 1303 (7th Cir. 2024) ......................................23

*United States v. Moore*, 817 F.2d 1105 (4th Cir. 1987) ..........................................21

*United States v. Norman*, 935 F.3d 232 (4th Cir. 2019) ...........................................7

*United States v. Smith*, 396 F.3d 579 (4th Cir. 2005) ...............................................14

*United States v. Sokolow*, 490 U.S. 1 (1989) ...........................................................16

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .......................................7

**Statutes**

19 U.S.C. § 1581 ......................................................................................................6, 7

19 U.S.C. § 482 .............................................................................................................6

**Other Authorities**

Brief of the Appellant, *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005) (No. 03-4907), 2004 WL 5200393 .........................................................6, 7

Bureau of Justice Statistics, *Human Trafficking Data Collection Activities, 2024*, (October 2024) available at https://tinyurl.com/ce5yhwvx .....................................................................17

Dep't of Justice Office of Public Affairs, *205 Child Victims Located and 293 Child Sex Abuse Offenders Arrested in Nationwide Crackdown* (Dec. 19, 2025), available at https://tinyurl.com/3h5x3pb9 .................................................................17

Dep't of Justice Office of Public Affairs, *Justice Department Announces Results of Operation Restore Justice* (May 7, 2025), available at https://tinyurl.com/2s45m36n.......................................17

U.S. Dep't of State, *2023 Trafficking in Persons Report: Bolivia*, https://tinyurl.com/mr3rn99a .....................................................................20

U.S. Dep't of State, *Trafficking in Persons Report* (2023),
https://perma.cc/DVR8-QV2D ...............................................................20

No. 25-4239

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

JOSE BELMONTE CARDOZO,
*Defendant/Appellant*.

_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

_____

REPLY BRIEF OF THE APPELLANT

_____

## **INTRODUCTION**

The government never meaningfully addresses the central premise of this appeal: that there is no real distinction in the degree of privacy intrusion occasioned by manual versus forensic searches of modern smartphones. The government never disputes that modern phones' onboard software enables searching that is just as thorough, just as efficient, and just as intrusive as the forensic search performed in *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018). In *Kolsuz*, this Court held

1

that individualized reasonable suspicion must exist to permit such a search, even at the border.

None of the three arguments the government *does* raise has merit. First, the government claims that this case is controlled by *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005). But *Ickes* never addressed the difference between routine and non-routine border searches and never used the term "reasonable articulable suspicion" because the appellant in *Ickes* made no Fourth Amendment claim. As both the briefing and this Court's opinion explain, the argument in *Ickes* was that there should be a "First Amendment exception to the border search doctrine," an argument this Court rejected. 393 F.3d at 502. It was in that context, and after reviewing the abundant probable cause that existed to arrest Mr. Ickes and to search his computer, that this Court commented that it would not "enthrone" a heightened suspicion requirement as a matter of constitutional law. *Id.* at 507. But because the Fourth Amendment issue was neither raised nor litigated, and because that statement was entirely unnecessary to the result, it was *obiter dicta* and does not constitute precedent. Moreover, for the reasons set forth in the opening brief, *Ickes* is fundamentally irreconcilable with *Riley v. California*, 573 U.S. 373 (2014). *See* App. Br. at 46.

Second, the government argues that reasonable suspicion existed in this case because of the report from Cash App and travel from Bolivia, but on both it plays

2

fast and loose with the facts.  With respect to the Cash App report, the government relies on the presence of the word "Snap" in a memo line as "particularly significant to Officer Oliphant because she knew predators 'quite frequently' 'elicited' CSAM on Snapchat."  Gov't Br. at 36; *see also id.* at 5 (same).  But Officer Oliphant testified that she had no idea whether that memo line was associated with Mr. Belmonte Cardozo.  J.A. 163.  The government relies almost exclusively on that single word to establish an inference that Mr. Belmonte Cardozo had engaged in a financial transaction related to CSAM but never explains how, absent a connection to him, the word "Snap" does anything to establish *individualized* reasonable suspicion.  Nor does the government explain how the report from Cash App, absent that reference, does anything to establish a connection to CSAM other than by unbridled conjecture.

The government's reliance on travel to Bolivia fares no better.  Regardless of whether the Court considers the State Department report referenced but not included in the record, the evidence about Bolivia does nothing to exclude a single member of the traveling public.  At most, the evidence establishes that human trafficking occurs in Bolivia—like it does in the United States and probably every other country in the world—without quantifying it in a way that shows whether travelers from Bolivia have any greater likelihood of engaging in such conduct than Americans or travelers from anywhere else.  Indeed, Officer Oliphant expressly admitted that her

3

knowledge did not distinguish travelers from Bolivia from anyone else at Dulles Airport. J.A. 154. The arguments in the government's brief do not change that.

And third, the government argues that the search here, if not expressly authorized by *Ickes*, was in any event performed in good-faith reliance on binding precedent. Not only does *Ickes* not control—for the reasons already discussed—but this Court in *Kolsuz*, 890 F.3d at 141, 146 n. 5, observed that the level of suspicion required for manual searches of electronic devices at the border was an open question in this Circuit in light of *Riley*. And it did so while extensively discussing *Ickes*, including in the very same footnote in which it noted that the question presented here was unanswered in this Circuit post-*Riley*. *Id.* at 140, 142, 146, 146 n. 5. In light of that chronology, neither *Ickes* nor *Kolsuz*—nor any other case from this Circuit—can fairly have been understood at the time of the search in this case to authorize customs agents to do what they did. Instead, operating in a gray area, the agents were testing what the Fourth Amendment allows in the *absence* of—rather than in reliance upon—binding precedent.

For these reasons, this Court should reverse the district court's denial of Mr. Belmonte Cardozo's motion to suppress, vacate his convictions, and remand for further proceedings.

**ARGUMENT**

I. *ICKES* DOES NOT CONTROL BECAUSE THE FOURTH AMENDMENT ISSUE PRESENTED HERE WAS NEITHER RAISED NOR LITIGATED IN *ICKES* AND BECAUSE ITS REASONING IS IRRECONCILABLE WITH *RILEY*.

    A.    <u>The Passage from *Ickes* the Government Relies Upon Is *Dicta* Because the Parties Did Not Raise or Litigate a Fourth Amendment Claim and It Was Unnecessary to the Decision.</u>

*Ickes* did not raise or decide the issue presented here. As the briefing makes clear, the appellant in *Ickes* began from the premise that the search of his computer was a routine border search but challenged whether the First Amendment required a heightened level of suspicion because computers contain expressive material. This Court's opinion began from that premise—treating the computer search as a routine border search and never raising whether it might be non-routine under the Fourth Amendment. Indeed, this Court's opinion never even used the term "non-routine" or the phrase "reasonable articulable suspicion;" instead, it repeatedly referred to Mr. Ickes's argument as a request for a "First Amendment exception" to the border-search doctrine. When the Court later referred to officers' "reasonable suspicions"—the only time it used a term anything like the legal standard at issue here—it did so only after reviewing the mountain of evidence that supported the search in that case. Accordingly, when the Court immediately thereafter commented that it need not "enthrone" a constitutional requirement for the search, it was neither a ruling on a Fourth Amendment challenge nor necessary to the Court's decision.

5

First, the briefing.  The appellant in *Ickes* raised two arguments—the legality of the search of his electronic devices and the propriety of the forfeiture order.  *See* Brief of the Appellant, *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005) (No. 03-4907), 2004 WL 5200393.  On the search issue, the defendant made two sub-arguments: that the search was not statutorily authorized and that a warrant was required because of the First Amendment implications of searching expressive materials.  *Id*. at 9-16.[1]  Indeed, the two point headings regarding the search read as follows: "1. As a Matter of Statutory Interpretation, Neither 19 U.S.C. § 482 Nor 19 U.S.C. § 1581 Authorize Searches of Computer Files;" and "2. The Files Contained in Computer Hard Drives and Disks Are Protected by the First Amendment from Warrantless Searches."  *Id.* at 10, 13.

To further illustrate that the *Ickes* constitutional challenge was under the First rather than the Fourth Amendment, the argument under the second point heading began as follows: "In addition to being unauthorized by section 482 or section 1581, the customs inspectors' warrantless search of the files on Mr. Ickes' computer hard drive and disks violated Mr. Ickes' rights *under the First Amendment."  Id.* at 13 (emphasis added).  Indeed, the Fourth Amendment was mentioned only twice in the

_____

[1] The page citations to the Appellant's Brief in *Ickes* are to the original image available on Westlaw because the electronic version on Westlaw is not paginated.

brief's Argument section—and both times as passing references in support of the statutory argument that preceded the constitutional challenge. *Id.* at 9, 13.

Second, this Court's opinion. As already noted, the Court began its opinion by noting the premise—unchallenged in the case before it—that "extensive searches at the border are permitted, even if the same search elsewhere would not be." *Ickes*, 393 F.3d at 502.[2] Immediately thereafter, the Court explained that it "refuse[d] to undermine this well-settled law by restrictively reading the statutory language in 19 U.S.C. § 1581(a) *or by carving out a First Amendment exception to the border search doctrine.*" *Id.* (emphasis added). Then, after dispensing with the statutory argument and turning to the constitutional challenge, this Court repeatedly characterized the issue not as a Fourth Amendment challenge to the intrusiveness of the border search, but as an argument for a "First Amendment exception" to the government's border-search authority. *See id.* at 506 (referring three times to appellant's argument for a "First Amendment exception" and once to his "First Amendment argument").

---

[2] The fact that the *Ickes* panel assumed the unchallenged premise that the search before it would have been a routine border search (but for Mr. Ickes's First Amendment challenge), means that the premise itself is *dicta*. "As the [Supreme] Court has explained, courts often decide 'particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions . . . are not binding in future cases that directly raise the questions.'" *United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990)).

A few sentences later, when the Court referred in passing to officers' "reasonable suspicions" and then stated that it need not "enthrone[] this notion as a matter of constitutional law," it began the immediately-following paragraph with "[t]here is an additional flaw in Ickes's *First Amendment claim." Id.* at 507 (emphasis added). In other words, both immediately before and immediately after the language the government seizes upon as a supposed Fourth Amendment holding, this Court made clear that it was ruling upon a First Amendment challenge. *See also id.* (concluding the discussion of the search by "reject[ing] Ickes's constitutional argument, and hold[ing] that the border search doctrine is not subject to a First Amendment exception.")

Thus, even if the snippet the government identifies in *Ickes* could plausibly be read as stating that reasonable articulable suspicion is not necessary *under the Fourth Amendment* to permit a manual search of an electronic device at the border, that holding would be dicta because it was entirely unnecessary and peripheral to the holding on the First Amendment issue that was raised and decided. *See United States v. Horsley*, 105 F.4th 193, 212 (4th Cir. 2024) ("A dictum is 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.'") (quoting *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999)). Indeed, as this Court further explained in *Pittston*, the reason such a statement is dicta is that it "may not have received the full and careful

8

consideration of the court that uttered it." 199 F.3d at 703 (internal quotations and citations omitted). And that is exactly the case here—as both the Appellant's brief in *Ickes* and the opinion demonstrate, the issue raised and analyzed by the *Ickes* panel did not include an argument that the search was non-routine and required reasonable articulable suspicion under the Fourth Amendment. This Court could not have given "full and careful consideration" to an argument that was not made.

Finally, the "enthrone" comment in *Ickes* came immediately after this Court catalogued the plethora of evidence that would have easily established probable cause were this Court to have found it necessary under the First Amendment challenge Mr. Ickes raised: "The agents did not inspect the contents of Ickes's computer until they had already discovered marijuana paraphernalia, photo albums of child pornography, a disturbing video focused on a young ball boy, and an outstanding warrant for Ickes's arrest." *Ickes*, 393 F.3d at 507. To be clear, the quantum of evidence that existed in *Ickes* was unnecessary to answer the precise question Mr. Ickes raised—which was whether a warrant was required by the First Amendment—because that would not have been resolved by evidence that would have been sufficient to obtain a warrant. But to the extent the case turned on whether reasonable suspicion was necessary, the Court's recitation of the evidence made clear that no such holding was needed even had the issue been raised because reasonable suspicion existed in spades. Accordingly, for this additional reason, the

"reasonable suspicions" passage in *Ickes* is dicta and does not constitute binding precedent on the Fourth Amendment issue raised here.

B.    *Ickes's* Holding That Computers and Hard Drives Were Indistinguishable for Privacy Purposes from Any Other "Cargo" Carried by Travelers Is Fundamentally Irreconcilable with *Riley*.

*Ickes* is not binding on this Court for the additional reason that it is impossible to reconcile with *Riley v. California*.  As the government recognizes, a prior decision of this Court is not binding upon a subsequent panel if it is impossible to reconcile with a subsequent Supreme Court decision.  *See* Gov't Br. at 18-19 (quoting *United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024)).  Underlying this Court's decision in *Ickes* was its finding that a border search of an electronic device was permitted because computers were no different than any other "cargo" a traveler carries.  *Ickes* 393 F.3d at 504.  To the extent that *Ickes* is read as a Fourth Amendment case— which it should not be, for the reasons set forth above—it is premised upon the *Ickes* panel's earlier finding that the privacy implications of searching electronic devices are no different than the privacy implications of searching any other "cargo" a person carries.  That holding is impossible to reconcile with *Riley*, the entire premise of which is the uniquely important privacy interests implicated by searching modern smartphones:

> Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. . . .

> One of the most notable distinguishing features of modern cell phones is their immense storage capacity. Before cell phones, a search of a person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy. . . .
>
> But the possible intrusion on privacy is not physically limited in the same way when it comes to cell phones.

*Riley*, 573 U.S. at 393-94.[3]

Accordingly, for this additional reason, *Ickes* is not binding on this panel with respect to the level of privacy intrusion associated with the search of a modern smartphone under the Fourth Amendment.

---

[3] Given that the opening brief included much of the same quote from *Riley*, *see* App. Br. at 22-23, it is difficult to understand the basis for the government's claim that there is no argument by Mr. Belmonte Cardozo that modern smartphones are distinguishable for privacy-intrusion purposes from the computer at issue in *Ickes* (which was searched in the year 2000). *See* Gov't Br. at 23. Computers in the year 2000 (and today) were not carried everywhere their owners went. They did not store precise GPS data for their owners' daily movements. They did not typically store every text message and photo their owners had taken or have a record of every phone call they had made. Nor did they have user-friendly onboard software that allowed a user to word-search the entire device with a few clicks. Rather, as the Supreme Court recognized in *Riley*, the privacy implications arising from searches of modern smartphones are *sui generis*. Mr. Belmonte Cardozo's opening brief did not suggest otherwise.

II.   THE SEARCH HERE WAS NOT SUPPORTED BY INDIVIDUAL-
      IZED REASONABLE ARTICULABLE SUSPICION.

    A.   The Cash App Report—Even Taking Reasonable Inferences in
         the Government's Favor—Provides No Individualized Suspicion
         About Mr. Belmonte Cardozo.

The government's effort to establish that the Cash App report provides

reasonable articulable suspicion about Mr. Belmonte Cardozo is so weak that it

requires a conspicuous mischaracterization of the record to get there. Both times the

government discusses the report, it begins by focusing on the word "Snap" in the

memo line associated with a single transaction in the report as the *sine qua non* that

established—in Officer Oliphant's mind based on her training and experience—a

connection to CSAM. *See* Gov't Br. at 5, 36-37. But the government never

acknowledges that Officer Oliphant had no idea whether that memo line was

associated with Mr. Belmonte Cardozo. J.A. 163. She testified that other

transactions in the report had unremarkable memo lines such as "food and stuff,"

and did not claim to know the content of any memo line associated with Mr.

Belmonte Cardozo. J.A. 156, 163.

    Accordingly, the government's principal argument about the Cash App report

is categorically insufficient because the term reasonable articulable suspicion

requires "individualized" suspicion. *See United States v. Curry*, 965 F.3d 313, 326

(4th Cir. 2020) ("Allowing officers to bypass the individualized suspicion

requirement . . . would completely cripple a fundamental Fourth Amendment

12

protection and create a dangerous precedent."); *Kolsuz*, 890 F.3d at 144 ("individualized suspicion is necessary" for a nonroutine border search); *Desroches v. Caprio*, 156 F.3d 571, 574 (4th Cir. 1998) ("[T]he [Supreme] Court has repeatedly emphasized that '[t]o be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing.'") (quoting *Chandler v. Miller*, 520 U.S. 305, 313 (1997)).

As set forth in the opening brief, the remainder of evidence about the Cash App report is even weaker. Officer Oliphant testified that the Cash App report listed "potentially suspicious financial data that would be indicative of possible CSAM purchases." J.A. 149. But on cross-examination it became clear that the words "potentially" and "possible" performed yeoman's work in that sentence. In total, as relates to Mr. Belmonte Cardozo, Officer Oliphant testified that the report showed that he had engaged in at least one financial transaction with an account associated with a minor—who he might not have known was a minor—in an unknown location and for an unknown reason at some point between ten and fifteen months before his phone was searched. J.A. 155, 157-158. She further testified that Cash App would have had no way of knowing the purpose of the payments—other than whatever could be gleaned from the memo lines—because Cash App is solely a money-transfer service that does not allow users to send images. J.A. 155-56. Nor did the report state that any witness provided information about the purpose of the

payments.  J.A. 156.  Nor did Officer Oliphant identify anything else in the report that evidenced the purpose of the payments.  J.A. 154-164.

The government's response to all this—that Mr. Belmonte Cardozo is not entitled to an inference that he was "sending lunch money to a younger sibling," *see* Gov't Br. at 38—turns Fourth Amendment jurisprudence on its head.  Mr. Belmonte Cardozo never asked the Court to draw that or any other inference.  Instead, that argument was raised to demonstrate that the CSAM inference the government asks the Court to draw "requires assumptions that the record cannot support."  App. Br. at 39.  That is because, while the government is entitled to inferences in its favor, it is entitled only to "rational inferences from [articulable] facts."  *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) ("In determining whether a detention is supported by reasonable suspicion, we look to the circumstances known to the officer and 'the specific *reasonable inferences* which he is entitled to draw from the facts in light of his experience.'") (quoting *Terry*, 392 U.S. at 27) (emphasis added).

Indeed, as set forth in the opening brief, this Court has repeatedly "warned against the Government's proffering 'whatever facts are present, no matter how innocent, as indicia of suspicious activity.'"  *United States v. Massenburg*, 654 F.3d 480, 482 (4th Cir. 2011) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)).  And that is exactly what the government is doing here: piling

unsupported inference upon unsupported inference to argue that a "mundane act[],"

*see id.*—a single financial transaction for an unknown reason with an account Mr. Belmonte Cardozo may or may not have even known to be associated with a minor—establishes reasonable suspicion that the transaction was a CSAM purchase.

At bottom, it is only by assuming criminality with no factual basis for that assumption that the Cash App report can be said to support reasonable suspicion in this case. Accordingly, because the Cash App report—absent rank speculation—establishes nothing relevant, it should be given no weight in establishing individualized reasonable articulable suspicion in this case, either alone or in conjunction with other evidence.

B.   The Information About Travel from Bolivia Failed to Distinguish Mr. Belmonte Cardozo from Any Other Traveler at Dulles Airport.

Regardless of whether the Court considers the State Department trafficking report referenced by both parties—which the government alluded to but did not include in the record to meet its burden of establishing reasonable suspicion—the evidence the government relies upon about Bolivia fails to exclude even a single member of the traveling public from the same suspicion Officer Oliphant expressed about Mr. Belmonte Cardozo. For that reason, it is insufficient to contribute to the reasonable-suspicion analysis. *See United States v. Brugal*, 209 F.3d. 353, 361 (4th Cir. 2000) (en banc) ("Under *Sokolow,* an officer's articulated factors in their totality

15

must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.") (citing *United States v. Sokolow*, 490 U.S. 1, 7-11 (1989)); *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008) (same); *United States v. Feliciana*, 974 F.3d 519, 523 (2020) (same); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) ("The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.")

First, considering solely Officer Oliphant's testimony, it is readily apparent (as she essentially conceded on cross examination) that everything she knew about Bolivia's rate of human trafficking could equally be said of the United States. That, by definition, means that her suspicion of passengers arriving on a flight from Bolivia was no different than the level of suspicion she could have had of every single passenger at Dulles Airport that day. Indeed, when asked if she knew whether the rate of trafficking in Bolivia was higher or lower than the rate in Virginia—the location of Dulles Airport, through which every single traveler that day was passing—she acknowledged that she did not. J.A. 154.

While providing no statistics, data or objective information that could distinguish those arriving from Bolivia from anyone else at the airport in terms of their likelihood of involvement in human trafficking or sex crimes, Officer Oliphant

did offer a few observations about human trafficking in Bolivia. She stated, for example, that "they continue having issues with human trafficking trends, as well as child sex trafficking in that country." J.A. 147. But the Department of Justice says the same thing about the United States. With respect to "trends," the Bureau of Justice Statistics reports that "[a] total of 1,912 persons were referred to U.S. attorneys for human trafficking offenses in fiscal year 2022, a 26% increase from the 1,519 persons referred in 2012." *See* Bureau of Justice Statistics, *Human Trafficking Data Collection Activities, 2024*, (October 2024) available at https://tinyurl.com/ce5yhwvx. And with respect to the fact that Bolivia "continues having issues," so does the United States, as evidenced by the Department of Justice's announcement of two nationwide crackdowns in the past year alone—Operation Restore Justice and Operation Relentless Justice—each of which resulted in the arrests of hundreds of child sex predators.[4] As these reports show, the observation that Bolivia "continues having issues" with "trends" in human trafficking and child sex trafficking does nothing to distinguish Bolivia from the

---

[4] *See* Dep't of Justice Office of Public Affairs, *205 Child Victims Located and 293 Child Sex Abuse Offenders Arrested in Nationwide Crackdown* (Dec. 19, 2025), available at https://tinyurl.com/3h5x3pb9; Dep't of Justice Office of Public Affairs, *Justice Department Announces Results of Operation Restore Justice* (May 7, 2025), available at https://tinyurl.com/2s45m36n (announcing arrest of 205 "child sexual abuse offenders").

United States.  Accordingly, these observations fail to differentiate those deplaning a flight from Bolivia from any innocent traveler in the United States.

Officer Oliphant's testimony that Bolivia "had increased rates of child sex trafficking," J.A. 153, is no different.  Not only do the statistics cited above suggest that the United States also has an "increased rate" of such activity, but Officer Oliphant acknowledged that she did not know what the rate was "increased" in comparison to.  J.A. 154.  For that reason, it adds nothing to the analysis.  Consider the following two sentences, the first of which is identical to Officer Oliphant's: "Country X has an increased rate of child sex trafficking.  It nonetheless continues to have the lowest rate of child sex trafficking in the world."  In other words, without knowing the baseline, the observation of an increased rate does nothing to distinguish such activity in Bolivia from that in the United States or any other country in the world.

That should be the end of the matter because the reasonable suspicion analysis is based on the facts available to the officer "at the moment of the seizure or the search."  *Terry*, 392 U.S. at 21-22.  As the government noted, neither party offered in evidence the State Department human trafficking report referenced in Officer Oliphant's testimony, but only what she recalled about it (in the testimony described above).  Gov't Br. at 41.  The government, as the party with the burden of establishing articulable facts supporting reasonable suspicion in the district court,

18

did not include the report in the record—and, even if it had, only the information known to Officer Oliphant when she initiated the search would be relevant under *Terry*.

Regardless, nothing identified by the government about the State Department report accomplishes anything more than Officer Oliphant's testimony. The government quotes general observations about the existence of trafficking crimes including sex-trafficking and forced labor in Bolivia without quantifying the problem, *see* Gov't Br. at 42, in much the same way that the government speaks of the "scourge" of CSAM in the United States. *See* Gov't Br. at 20. Such generalities, for the reasons set forth above, could be said of almost any country—and *are* said by the Department of Justice about the United States. Accordingly, they do nothing to distinguish those arriving from Bolivia from anyone else arriving at or leaving from any airport in the United States.

The government further undermines its argument about the State Department report by falsely quoting one of the two portions it relies upon. Specifically, the government claims that Tier 2 watch list countries are those where the rate of severe forms of trafficking activity is "very significant" (or "significantly increasing") and where the country fails to provide evidence of increasing efforts to combat severe forms of trafficking. Gov't Br. at 43. According to the report the government cites, however, the term is defined as countries that either have a "very significant" (or

"significantly increasing") rate of severe forms of trafficking <u>or</u> have not provided evidence of increasing efforts to combat severe forms of trafficking. *See* U.S. Dep't of State, *Trafficking in Persons Report* (2023), https://perma.cc/DVR8-QV2D. The difference between the disjunctive and the conjunctive, at least in this instance, is significant: it is the difference between the report finding that Bolivia has a very significant (or significantly increasing) rate of severe forms of trafficking and not making such a finding. And indeed, the Report explains that Bolivia was included for not "demonstrat[ing] overall increasing efforts [to eliminate trafficking] compared with the previous reporting period"—not because of an increased incidence of trafficking. *See* U.S. Dep't of State, *2023 Trafficking in Persons Report: Bolivia*, https://tinyurl.com/mr3rn99a.[5]

For all these reasons, Mr. Belmonte Cardozo's travel to Bolivia—whether one looks only to Officer Oliphant's testimony or to the State Department report as well—fails to add to the reasonable suspicion analysis because the evidence does nothing to exclude even a single innocent traveler from the same level of suspicion that applies to travelers from Bolivia.

---

[5] Reading further into the document, it appears that Bolivia's inclusion in the watch list was due to a failure to report information during the relevant time period rather than a change in efforts to combat trafficking. *See 2023 Trafficking in Persons Report: Boliva*, *supra* (Bolivia "did not report" information during the reporting period, "making it difficult to assess progress.")

Moreover, as the law makes clear in cases involving "high crime areas," association with an area known for crime can never in itself establish reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion"); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) ("[T]he defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion"); *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) ("[T]he fact that someone was in a 'high crime neighborhood' is not by itself enough to raise a reasonable suspicion"). Accordingly, even if the Court were to place any weight on travel to Bolivia in the reasonable-suspicion analysis, it would be insufficient as a matter of law unless the Court also finds that the Cash App report supports reasonable suspicion, which it should not for the reasons argued above.

III.    GOOD-FAITH RELIANCE ON BINDING PRECEDENT DOES NOT EXCUSE A FOURTH AMENDMENT VIOLATION WHEN AGENTS ACT IN THE ABSENCE OF AUTHORITY.

The parties agree that suppression is not required in the case of a Fourth Amendment violation where agents acted "in reasonable reliance on binding precedent." *United States v. Aigbekaen*, 943 F.3d 713, 725 (4th Cir. 2019) (quoting *Davis v. United States*, 564 U.S. 229, 236-37 (2011)). But, having abandoned its

initial (and incorrect) contention that the search here was expressly authorized by *Kolsuz*, *see* J.A. at 75, the government fares no better with its pivot to *Ickes*.

That is so not only for the reasons set forth in Part I above—showing that the issue presented here was not raised in, much less decided by, *Ickes*—but also because any confusion about what *Ickes* stands for with respect to the Fourth Amendment was dispelled by *Kolsuz*. In fact, *Kolsuz* twice observed that the question presented here—whether the Fourth Amendment permits a manual search an electronic device at the border without suspicion—is unanswered in the Fourth Circuit. 890 F.3d at 141, 146 n. 5. And it did so in the context of discussing *Ickes*—in the very same footnote in which it explained that the Fourth Circuit had not yet considered how *Riley* impacts the standard for "manual searches of digital devices at the border." *Id*. at 146 n. 5.

Accordingly, the government fails to identify any binding appellate precedent deciding the issue presented here. As a result, the government's citation to *Aigbekaen's* good-faith holding, *see* Gov't Br. at 46, has it backward. *Aigbekaen*— which was decided after *Kolsuz* but involved a search that pre-dated *Kolsuz*— concluded that the search before it required a warrant, but applied the good-faith exception because, at the time of the search, "no court had yet applied [Fourth Amendment law] to require a warrant for *any* border search, no matter how nonroutine or invasive." 943 F.3d at 725 (internal quotations and citation omitted).

22

The same cannot be said here. It is not true that "no court has required reasonable suspicion for a border search of a smartphone." This Court has. And when it did so, in *Kolsuz*, it clarified that it was not deciding whether the same rule applied to manual searches. 890 F.3d at 141.

Finally, the government misses the point in its repeated references to Mr. Belmonte Cardozo's discussion of CBP's policy requiring him to provide the passcode to his devices—which the government characterizes as an attempt to raise a Fifth Amendment challenge not raised below. *See* Gov't Br. at 47. The fact that Mr. Belmonte Cardozo was required to provide the passcode was raised for two reasons. First, because the passcode was used to access encrypted information on the phone and to access the phone's most private "nooks and crannies," demonstrating the intrusiveness of the search. *See* App. Br. at 30-31 (distinguishing the search here from that in *United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024); *Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021); and *United States v. Castillo*, 70 F.4th 894, 897–98 (5th Cir. 2023)). And second, CBP's demand for the passcode cuts against the government's claim that CBP's actions were taken in good-faith reliance on binding precedent. Whether Mr. Belmonte Cardozo has a Fifth Amendment right to withhold the passcode is an open question in this Circuit. *See* App. Br. at 34 n. 18. The government suggests that this Court would disagree with the D.C. Circuit and the 11th Circuit on that issue, and while that may be correct, the

23

government cites only an unpublished per curiam decision for that contention. Gov. Br. at 32. The fact that CBP expressly informed Mr. Belmonte Cardozo that it had the power to compel provision of his passcode when it is not at all clear that it had such authority is further evidence that the government was not acting in good-faith reliance on precedent.

As all these circumstances demonstrate, the agents here were acting in the absence of, rather than in reliance upon, binding appellate precedent. The government's attempt to apply the good-faith exception in these circumstances would transform the exception from a safe harbor for actions taken in reasonable reliance on binding precedent into an entitlement to do whatever this Court has not expressly prohibited. This Court has never described the good-faith exception as such an entitlement, and it should not do so here.

## CONCLUSION

For these reasons, as well as those presented in the opening brief, this Court should reverse the District Court's Order denying Mr. Belmonte Cardozo's Motion to Suppress, vacate Mr. Belmonte Cardozo's convictions, and remand for further proceedings.

Respectfully submitted,

GEREMY C. KAMENS
Federal Public Defender
for the Eastern District of Virginia

<u>s/ Todd M. Richman</u>
Todd M. Richman
Salvatore M. Mancina
Assistant Federal Public Defenders
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Todd_Richman@fd.org
Sam_Mancina@fd.org

January 12, 2026

# CERTIFICATE OF COMPLIANCE

1.    This Reply Brief of the Appellant has been prepared using Microsoft Word 365 software, Times New Roman font, 14-point proportional type size.

2.    EXCLUSIVE of the table of contents, table of authorities, signature block, and this certificate of compliance, this brief contains no more than 6,500 words, specifically 5,722 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

January 12, 2026
Date

s/  Todd M. Richman
Todd M. Richman
Assistant Federal Public Defender